# In the United States Court of Federal Claims

No. 09-291T
(Filed: January 29, 2015)

*************************************

| | |
|---|---|
| ESTATE OF DAVID RUBINSTEIN, | * |
| | * Tax Refund Claim; Overpayment; |
| Plaintiff, | * RCFC 52; 26 U.S.C. § 6511(h); |
| | * Rev. Proc. 99-21, 1991-1 C.B. 960; |
| v. | * Financial Disability; Physical or |
| | * Mental Impairment; Suspend |
| THE UNITED STATES, | * Statute of Limitations; Adverse |
| | * Credibility Finding; Unreliable |
| Defendant. | * Expert Testimony |

*************************************

Joseph A. Broyles, Los Angeles, CA, for plaintiff.

Karen M. Groen, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

In this federal income tax refund case, plaintiff, the estate of David Rubinstein, alleges that during at least the last four years of Mr. Rubinstein's ("decedent") life, he suffered from a mental impairment that resulted in a financial disability within the meaning of 26 U.S.C. § 6511(h). According to plaintiff, the statute of limitations for the filing of plaintiff's tax refund claim was suspended because of the decedent's financial disability. A two-day trial was held in Washington, DC, during which the court heard testimony from Dr. Robert Blee, who was the decedent's attending physician, and from the decedent's two sons, Joel and Michael Rubinstein. This opinion resolves the issues presented at trial concerning plaintiff's entitlement to invoke the suspension exception set forth in the statute. Based upon the evidence adduced at trial detailing the decedent's ability to live on his own, perform daily activities, and manage complex investments, coupled with the court's adverse credibility finding with respect to the linchpin of plaintiff's case—plaintiff's expert—the court finds that plaintiff has not sustained its burden to establish by a preponderance of the evidence that the decedent was financially disabled as contemplated by § 6511(h). Thus, the court denies plaintiff's request to suspend the applicable statute of limitations.

# I.  FACTS

This tax refund suit stems from the late filing of the decedent's 2001 tax return.  In order to determine whether the decedent was, in fact, financially disabled, i.e., mentally impaired within the meaning of § 6511(h), the court must closely examine the facts surrounding the final years of the decedent's life.  The following discussion details his range of activities during the pertinent time frame. [1]

## A.  The Decedent's Family

The decedent and his wife had a daughter, Tr. 388-89 (J. Rubinstein), and two sons, Joel and Michael, id. at 253.  The decedent's wife died in 1982.  Id. at 264.  Until his death in 2005, the decedent lived by himself in his home in Potomac, Maryland.  Id. at 264 (J. Rubinstein), 465, 523 (M. Rubinstein).

Until 2001, the decedent's older son, Joel, acted as his "unpaid, informal tax preparer." Id. at 254, 257 (J. Rubinstein).  Joel became estranged from his father, however, for nearly the last three years of his life.  Id. at 342.  The decedent's younger son, Michael, maintained a relationship with his father until 2004.  Id. at 521 (M. Rubinstein).  Michael described his father as "one of the smartest men [that he had] ever met."  Id. at 466.  Although English was not the decedent's first language and he did not come to the United States until he was sixteen, he "spoke English better and more articulately than most native-born speakers.  He could comment intelligently about any number of things, [including] math and statistics, [] science in general, [] politics, [] music, [] art, [about] almost anything."  Id.

## B.  The Decedent's Personal Activities

In his final years, the decedent engaged in a full range of activities.  He cooked his own meals, and fed and clothed himself.  Id. at 504, 506, 523-24 (M. Rubinstein).  Other than preparing his tax returns, the decedent handled all of his financial and personal affairs himself, including paying bills, banking, grocery shopping, lawn maintenance, and laundry.  Jt. Stip. ¶ 4; DX 14; DX 15; Tr. 395 (J. Rubinstein), 506 (M. Rubinstein).  At some point during the last two years of his life, the decedent hired an individual to mow his lawn.  Tr. 397-98 (M. Rubinstein).

## C.  The Decedent's Social and Religious Involvement

The decedent also supported social and religious organizations.   For example, in 2001, he made donations to WETA, a public television and radio station, contributing $200 in February, another $50 in July, and $60 in November.  DX 19 at 4.  Additionally, in November 2001, the decedent donated $3,000 to the American Society for Technion-Israel Institute of

---

[1]  The facts set forth in the "Facts" and "Discussion" sections of this opinion constitute the court's findings of fact in accordance with Rule 52(a) of the Rules of the United States Court of Federal Claims.  In addition, rulings on mixed questions of law and fact are set out in the "Discussion" section.  Plaintiff's exhibits are denoted as "PX," and defendant's exhibits are designated as "DX."  The parties' joint exhibits are denoted as "JX."  References to the trial transcript are by page and witness.

Technology, id. at 1, and $100 to the Jewish Social Service Agency, id. at 3.  In December 2001, he made a $200 donation to the Jewish Community Center of Greater Washington.  Id. at 2.  The decedent also paid a $475 membership fee to Congregation Har Shalom in 2001, and $40 in dues to its men's club.  Id. at 5.

During his marriage, the decedent's wife directed the family's social life, but after her death, the decedent "kept up with [] the family friends[,] continu[ing] to maintain [those] relationships."  Tr. at 466 (M. Rubinstein).  The decedent "participated in a number of social groups:  Parents Without Partners, the Yiddish Club, and a variety of [social organizations]."  Id. Michael testified that he was aware that at least until 2000, the decedent was active in his synagogue men's club, and that he entertained this and other groups at his home.  Id. at 467. Michael also testified that "until he died," the decedent "had a monthly meeting with his friend, Dan Lorie, like a lunch."  Id.  In addition, until his death, the decedent maintained friendships with two other long-time friends, people who he and his wife had socialized with years before as part of a dinner club that met once a month.  Id. at 468-69.

Although the decedent continued his friendships, Michael observed changes in his father's family relationships, such as his severing relations with Joel.  Id. at 471.  The decedent was "very, very close" to Aaron, who was Michael's son and the decedent's only grandchild.  Id. The decedent would socialize with Michael, Michael's wife, Julie, and Aaron at least every two weeks for dinner.  Id. at 472, 476-77.  By about 2003, however, the decedent was no longer interested in seeing his grandson.  Id. at 472.  As Michael explained, "if a month [went] by and [the decedent hadn't] seen [his grandson,] all of a sudden, he [was] not complaining anymore." Id. at 472.  At the end of April 2004, when Michael held his annual family gathering celebrating Aaron's birthday, the decedent refused to attend because Joel would be there.  Id. at 472-73. Michael explained that he exhorted his father to attend his grandson's birthday party, telling him:

 ["T]his is not about you.  It's not about Joel.  It's about your grandson, and you need to be there for him.["]  And he said, ["]I'm not going.["]  And I said, ["]yes, you are going.  You can stand on the other side of the room.  You do not need to talk to my brother.  But for your grandson's sake, you need to be there.["]  And he refused to go.  And at that point, not only did he refuse to go, but he stopped seeing us.  He did not see me.  He did not see my wife.  He did not see my [son] [] for a year . . . so that when I came into the hospital . . . , shortly before he died, I had not seen him for a year.

Id. at 473.  Even as the decedent's relationship with his sons declined, however, he maintained his relationship with his daughter, Shana.  Id. at 483, 521.  Michael testified that his sister "lives in the area," and that because the decedent "was still in communication with" her, Michael "could talk to her anytime" about how their father was doing.  Id. at 521.  Shana was not called as a witness to testify in this case.

Michael also testified that even when he noticed changes in his father due to aging, he "always felt that [his father] was smart."  Id. at 469.  According to Michael,

"[such changes in the decedent] didn't seem to affect his intelligence in the sense that if you were to talk to him, he would seem aware.  You know, this was not a guy who was . . . wandering down a hall in his slippers and bathrobe wondering who he is and who you are and what the date is.  So in that sense, you could have an intelligent conversation with him.  But I noticed lots and lots and lots and lots of changes in terms of his behavior and in terms of his reasoning and in terms of his ability to cope with his life and his finances and all of that."

Id. at 469-70.

### D.  The Decedent's Home

The decedent's wife took meticulous care of the family home, insisting that family members assist with "clean[ing] up" around the house.  Id. at 264 (J. Rubinstein).  After her death, "papers would start to appear" on the kitchen and dining room tables.  Id.  Joel testified that while there was a "slow and gradual deterioration in the house over the years," id. at 262, and that "clutter" and "other objects" were kept in a "very disorganized way," id. at 264, it was nonetheless "relatively well kept up."  Id. at 262, and "sanitary," id. at 264.  Prior to the decedent's death, Joel's last visit to his father's home was in 2002.  Id. at 255, 258, 262.  In a similar vein, Michael testified that by 2001, the inside of the house was cluttered with papers.  Id. at 488 (M. Rubinstein).  His spouse, Julie, took a six-week leave of absence from work between May and June of 2001 to "declutter" the decedent's home and organize his papers.  Id. at 486-87; see also id. at 487-88 (describing garbage bags of unopened mail).

According to Michael, the decedent was capable of performing his "ADLS [activities of daily living] until the day he died," id. at 504, including buying groceries, id. at 502-3, paying bills, id. at 506, and driving to the grocery store, id. at 491.  Michael also provided additional testimony about his father's capabilities: "I thought he could feed himself.  I thought he could cook his own meals.  What I didn't think that he could do was manage his papers and his finances, that he could keep the house in order . . . ."  Id. at 524.

The decedent's children never discussed any form of involuntary commitment or mental health examination for him.  Id. at 522-23.  Michael did not worry that the decedent was in any danger while living by himself; indeed, because the decedent was able to carry out daily living activities, Michael had no intention of trying to forcibly remove him from his house.  Id. at 523-24.  Michael encouraged his father to transition to a retirement home, telling him that Michael and his family would move into the decedent's home, thereby greatly reducing Michael's commute between work and home.  Id. at 485-86.  Thus, the push to clean and organize the decedent's home was, in part, intended to assist with the decedent's transition to an assisted living facility.  Id.  Ultimately, the decedent declined to move because he prized his independence.  Id. at 504-5.

Michael testified that, prior to his father's death in 2005, he had not been in the house since 2003.  Id. at 489.  According to Michael, when he entered his father's home in 2005, he found paper on virtually every surface.  Id.  In addition, as he cleaned out the house, Michael

wore a mask because of the dust.  Id. at 512.  Michael also testified that the kitchen was "filthy." Id.

## E.  The Decedent's Financial Acumen and Strategy

At the time of his retirement, the decedent was not a millionaire.  Id. at 429.  Because of his financial acumen, however, he assembled a stock portfolio valued at nearly six million dollars by the time of his death.  Id. at 301; JX 35 at 1; DX 10.  The decedent accumulated his assets by buying and selling stocks himself, or through his broker.  Tr. 303, 412-13 (J. Rubinstein).  For example, on January 5, 2000, he bought 20,000 shares of Security Financial Bancorp, Inc. common stock.  DX 44.  In addition, between 2001 and 2004, he made at least four stock purchases.  DX 39; Tr. 412-13, 432 (J. Rubinstein).  One of these purchases included shares of NewAlliance Banc stock; he instructed his broker on March 1, 2004, to acquire, on his behalf, 12,784 shares during the initial public offering.  Tr. 413 (J. Rubinstein); DX 13 at 1.  The decedent purchased this stock at $10 per share, and when he died, the total value of these shares was $186,263, representing a 46% increase in the sixteen months following the date of purchase. DX 13 at 1; DX 11 at PL 0210.

In addition to his purchase of stock, between 2001 and his death in 2005, the decedent engaged in at least twenty-five stock sales.  DX 40.  The value of one such sale exceeded $364,000.  Id.  Four of these stock sales occurred in 2001, id., some of which were the result of mergers and acquisitions between entities, while others were initiated by the decedent, Tr. 302 (J. Rubinstein).  Between 2002 and 2005, the decedent executed at least one or two stock sales, id. at 331; one involved instructing his broker to sell, on his behalf, his New York Community Bancorp., Inc. shares on June 18, 2004, just over a year before his death, id. 303, 306-11, 432. At the time of his death, the value of the decedent's stocks and bonds exceeded $4.7 million. DX 13.

In addition, the decedent actively engaged in a bank demutualization investment strategy. Jt. Stip. ¶ 6.  A bank demutualization occurs when a bank that was previously owned by depositors is converted to a stock corporation.  Tr. 324 (J. Rubinstein).  During the conversion, an initial public offering is made, and stock in the new company is sold.  Id.  Investors who purchase that stock collectively own all of the money that they have each paid to buy the company, as well as the value that was previously held by the depositors.  Id.  Thus, initial investors in the company are positioned to receive a windfall, as they buy in and obtain "a piece of an existing pie, in addition to the pie" that they are creating by buying in.  Id. at 325.  In many instances, the bank gives priority to those who have deposits in the bank over nondepositors, where the number of shares that an investor is allowed to purchase can be proportional to the size of his account.  Id.  Accordingly, the decedent opened accounts in several banks, in order to be included in the group that received priority, and thus, a monetary windfall, when the demutualization later occurred.  Id.  The decedent researched and carried out this investment strategy entirely on his own.  Jt. Stip. ¶ 6.  Between 2001 and 2005, he opened new bank accounts at eight different banks, DX 41, and at his death in August 2005, held seventy-five such accounts, Jt. Stip. ¶6.

**F.  The Decedent's Basis Book**

To keep abreast of his complex investments, the decedent maintained a notebook reflecting activities related to them, which the parties referred to as the "Basis Book." Tr. 308 (J. Rubinstein). In the Basis Book, the decedent chronicled the history of, and recorded significant information and events concerning, each of his securities. Id. at 308-09; Jt. Stip. ¶ 7. This detailed notetaking included listing the name of each security, as well as the company's address, contact information, and ticker symbol. Tr. 308 (J. Rubinstein). The decedent documented details of each transaction, noting the acquisition of the security, along with some of the history behind the transaction, including whether it was the result of a merger. Id. at 309. He would at times record dividends that issued, as well as the value of the shares of stock. Id.

The decedent also memorialized details regarding his stock sales. For example, on August 13, 2001, he recorded that he directed a broker, "Tucker Anthony," to sell his stock in Security Financial Bancorp, and to have the money wired to his Presidential money market account. Id. at 400-01; DX 11 at PL 0131. The decedent realized over $364,000 from that sale. DX 11 at PL 0131. Additionally, when there was a forced sale of his stock, such as that of Bay State Bancorp in June 2003, the decedent recorded details of the sale and the resulting income in the Basis Book. Tr. 400-08 (J. Rubinstein).

Beyond documenting information concerning stock acquisitions and sales, the decedent also used the Basis Book to record the details of the complicated stock splits of some of his investments, and to calculate dividends and stock values. Id. at 407-09; DX 11. The decedent recorded these calculations until his death in 2005. Tr. 408-09 (J. Rubinstein). Indeed, after his father died, Joel found the Basis Book to be of "great assistance" when preparing the decedent's personal and estate tax returns. Tr. 313-14 (J. Rubinstein).

**G.  Dr. Blee's Treatment of the Decedent and Submission of a Physician's Report to the Maryland Motor Vehicle Administration**

Dr. Blee served as the decedent's primary care physician from 1987 until the decedent's death in 2005. DX 21 at 3. Over the years, the decedent would visit Dr. Blee for forty-five-minute physicals, twenty-five minutes of which were spent speaking with Dr. Blee. Tr. 146-49, 221-22 (Blee).

On September 21, 1999, Dr. Blee sent the decedent a letter with a summary of his physical examination from September 8, 1999. JX 31 at 1. Dr. Blee noted that "[p]sychologically," the decedent "seemed rather flat[,] consistent with mild depression." Id. According to Dr. Blee, the decedent's score after a "mini-mental status" was "basically stable from . . . previous examinations." Id. "Therefore, in summary," Dr. Blee concluded, "the memory loss may [have been] due to small vessel disease and not necessarily Alzheimer's disease[,] in view of the minimal progression over the last several years." Id.

On February 22, 2005, the Maryland Motor Vehicle Administration ("MVA") sent Dr. Blee a letter, DX 22, and a form entitled "Physician's Report," DX 21. The physician's report ("MVA physician's report") is a four-page form provided by the MVA to an applicant motorist's

attending physician for completion and certification.  Id.  The letter from the MVA was prompted by the decedent having struck three parked cars while driving.  Tr. 130, 132 (Blee).  The letter stated that the MVA had temporarily suspended the decedent's driving privileges, subject to a hearing.  DX 21 at 1.  In order to reinstate the decedent's license, an evaluation of the decedent's fitness to drive a motor vehicle was required.  Id.; Tr. 132-33 (Blee).  Because the decedent informed the MVA that Dr. Blee was his treating physician, the letter requested that Dr. Blee complete the physician's report evaluating the decedent's fitness to drive a motor vehicle, based on Dr. Blee's most recent examination of the decedent, and return it to the MVA.  DX 22.

On February 28, 2005, Dr. Blee provided information on the physician's report, certified it, and then sent it to the MVA.  DX 21.  The report contains eight sections, most of which seek information regarding the applicant's physical and/or mental fitness to operate a motor vehicle.  Id.  These eight sections are entitled:  General Information; History; Physical, Neurological and/or Psychiatric Examinations; Current Diagnosis and Medications; Laboratory; Results of Treatment to Date; Prognosis; and Physician's Certification.  Id.  The first section, "General Information," seeks only six items of information:  the applicant's name, address, date of birth, telephone number, driver's license number, and social security number.  Id. at 1.  The second section, "History," enumerates eighteen conditions, and requires that the physician disclose whether the applicant was treated for any of these conditions during the preceding two years.  Id. at 1-2.  The form instructs the physician to circle "yes" or "no" for each of the eighteen conditions, and to "clarify any []" answers" that are marked "yes" in the comment section that follows.  Id. at 1.  Next to the columns denoted "Yes" and "No" is a column entitled "Date," with a blank line ("date line") for each condition.  Id. at 2.

In this second section of the report, Dr. Blee circled "yes" for conditions one, two, six, and seven.  Id. at 1-2.  The first two conditions are "Motor Vehicle Accident" and "Driver's License Revocation, Suspension, Cancellation."  Id. at 1.  With respect to condition six, "Nervousness," Dr. Blee circled "yes," and wrote "depression-chronic" on the date line next to it.  Id. at 2.  Dr. Blee also circled "yes" for condition seven, "Depression/Confusion/Other Psychiatric Disorders."  Id.  In the comment portion of section two, Dr. Blee wrote:

> -Mild depression – controlled with meds.
>
> -[History] of memory loss which has been without change for years.  It is mild and may be just normal aging given the lack of change for many years.  He does not appear to have Alzheimers given the stability of the problem.

Id.  Dr. Blee circled "no" for condition three, "Blackout Spells, Dizzy Spells, Epilepsy, Seizures, Loss of Consciousness," condition four, "Other Neurological Impairments," and condition five, "Head Trauma/Brain Surgery."  Id. at 1-2.  However, Dr. Blee left blank the remaining eleven conditions in section two, providing no response.  Id. at 2.

Section three of the form, "Physical, Neurological and/or Psychiatric Examinations," directs the responding physician to "Note POSITIVE Findings Only," and provides space for five such findings.  Id.  Dr. Blee provided only two comments.  First, he wrote "Exam," followed by a medical symbol, id., that signified that he found the decedent's "arms, legs, vision, [and] talking to

him" to all be "normal," or "negative" for any problems, Tr. 184-84 (Blee). Second, Dr. Blee wrote "mini mental status exam (MMS[E]) are [sic] attached." DX 21 at 2. Where the form requests the "Status/level of impairment," Dr. Blee circled the word "ambulatory." <u>Id.</u>

Dr. Blee responded to section four, "Current Diagnosis and Medications," by stating that the decedent suffered from age-related memory loss, hypertension, and hyperlipidemia. <u>Id.</u> at 3. He did not mark anything in section five, "Laboratory." <u>Id.</u> In section six, "Results of Treatment to Date," Dr. Blee wrote "memory stable since 1997." <u>Id.</u> Section seven, "Prognosis," provides a scale from "Poor" to "Excellent." <u>Id.</u> Dr. Blee placed a check mark next to both "Fair," and "Good." <u>Id.</u> at 4. Finally, in section eight, "Physician's Certification," Dr. Blee wrote, "Can probably drive in non stressful [sic] [and] familiar circumstances. Would probably have difficulty with rapid mental reaction, or unfamiliar areas. A GPS would be useful." <u>Id.</u> Where the form provides, "[i]n my professional opinion, this person is physically/mentally capable of safely operating a motor vehicle at this time," Dr. Blee marked "yes." <u>Id.</u> Dr. Blee also indicated that the decedent had been under his care since 1987. <u>Id.</u> In the comment portion of section eight, Dr. Blee wrote the following: "The [patient's] capability of driving could be best determined by a road test with an observer. The above answers are based on an exam from 2/28/05[,] which is when I last saw Mr. Rubinstein." <u>Id.</u> The February 2005 examination was the final one that Dr. Blee conducted of the decedent before his death approximately five months later. Tr. 172 (Blee).

## H.  The Decedent's Tax Filings

As noted above, until 2001, Joel acted as the decedent's informal tax preparer. <u>Id.</u> at 254, 257 (J. Rubinstein). Joel would prepare his father's tax returns, and the decedent would review and file them. <u>Id.</u> at 258, 260. The last tax return that the decedent filed was for the 2000 tax year. DX 7.

As Joel prepared his father's tax returns, the decedent would provide assistance. For example, while Joel entered the decedent's information into the tax software program that he used to prepare a tax return, Joel would ask his father questions "from time to time" with respect to various issues concerning the return. <u>Id.</u> at 278 (J. Rubinstein). By way of illustration, if Joel had a question concerning whether a donation that the decedent had made was deductible, Joel would "have to ask [the decedent] for help." <u>Id.</u>

Once Joel completed the tax return, he would give it to the decedent to be filed. <u>Id.</u> at 278-79. On a few occasions, the decedent requested an extension of time to file his tax return. <u>Id.</u> at 257, 353. The decedent, not Joel, submitted each extension request. <u>Id.</u> at 354.

Beginning in 2000, relations between Joel and the decedent "became increasingly strained," and they engaged in numerous arguments regarding family issues. <u>Id.</u> at 254, 260 (J. Rubinstein). Their relationship became further strained after Joel prepared, and his father filed, the decedent's 2000 tax return. <u>Id.</u> at 257. Prior to filing that return, the decedent had received an extension of time for its filing, and subsequently filed it within the additional time allowed. <u>Id.</u> at 257-59. However, because Joel was unaware of one of the decedent's investments, the 2000 tax return contained an error; the Internal Revenue Service ("IRS") discovered the error and assessed additional taxes and penalties. <u>Id.</u> at 259-60. It appears that due to the error, the

decedent no longer trusted his son's work, believing that Joel "was not 100[%] reliable." Id. at 260.  Consequently, when Joel prepared the decedent's 2001 tax return, it seems that the decedent's "suspicions were raised," such that he "felt the need" to review the return with heightened scrutiny.  Id.  The 2001 tax return contained "check[ ]marks" on some of the interest and dividend items, which the decedent had made while comparing the tax return to an IRS transcript of income.  Id. at 280-82.

The check marks on the 2001 tax return indicate that the decedent had been "attempting to audit [Joel's work]" to ensure that the information had been entered correctly, id. at 279, likely to avoid a penalty.  The decedent's wariness in avoiding tax penalties was apparent in his tax payment strategy over the years.  Id. at 393.  He made six estimated payments toward his 2001 tax liability, four payments toward his 2002 tax liability, two payments toward his 2003 tax liability, and one payment toward his 2004 tax liability, Jt. Stip. ¶¶ 9-10, writing a check for each, Tr. 389-90 (J. Rubinstein).  He deliberately made such overpayments in order to build a "substantial cushion" in tax prepayments and "avoid [an] underpayment penalty."  Id. at 393.  Ultimately, the decedent did not file the 2001 tax return.  Id. at 279.

Joel contacted his father in 2002, but the decedent said that he did not want to speak with him, and refused his son's apologies.  Id. at 254.  The decedent also declined Joel's request that his father explain why he was upset with him, Joel's suggestion that they "bury the hatchet," and Joel's offer to work on the decedent's tax returns.  Id. at 254-55.

### I.   Plaintiff's Submission of the 2001 Tax Return and Letters to the IRS

Subsequent to the decedent's death in 2005, Joel served as the administrator of the estate.  Id. at 254.  Upon investigation, Joel discovered that his father had not filed the 2001 tax return that Joel had prepared.  Id. at 283.  In 2006, Joel filed the decedent's tax returns for tax years 2001 through 2005.  Id. at 417-18; DX 7.  The late-filed 2001 tax return reported an overpayment in the amount of $48,489.  DX 7.  On April 17, 2006, Joel sent the IRS a letter stating that the decedent's 2001 tax return reported the overpayment, and requesting that that amount be credited to the 2002 tax year.  Id.  Joel's letter also advised the IRS that the decedent had been initially diagnosed with Alzheimer's disease, but that his diagnosis was later revised to dementia.  Id.  The letter further contended that during the last five years of the decedent's life, his dementia prevented him from timely filing tax returns for the 2001 through 2004 tax years.[2]  Id.

After his father's death, Joel approached Dr. Blee for assistance in proving to the IRS that his late father lacked mental competence.  DX 26 at 2; JX 37 at 1.  Specifically, Joel requested that Dr. Blee prepare and send to the IRS a letter confirming his father's alleged mental impairment.  Tr. 203 (Blee).  Until he was contacted by Joel, Dr. Blee had no knowledge of the decedent's family.  Id. at 223.  On September 29, 2006, Dr. Blee complied with Joel's request and sent the IRS a letter stating that during the last ten years of the decedent's life, the decedent was mentally incompetent:

---

[2]  Because the decedent died in August 2005, he would not have prepared a 2005 tax return.

Mr. Rubinstein had been a patient of mine for many years prior to his death in 2005. During the last ten years of his life, I was treating him for progressive memory loss and depression.  His memory loss was progressive and was of the Alzheimer's type. He was treated for Alzheimer's disease in the standard fashion with medication.  I counseled him on many occasions that he needed to get into assisted living and get out of his house, as there were concerns for his own safety.  Certainly, during the last four or five years of his life, I do not think that he was capable of managing his own affairs effectively and intelligently.  He certainly was not capable of making any executive decisions of any meaningful variety.  He was essentially mentally paralyzed by his illness. . . .

It is my understanding that while Mr. Rubinstein paid his taxes, he did not submit his forms with them and certainly this does not surprise me at all, as again he was not mentally capable of handling his own affairs in a competent way, in my opinion, possibly dating back even into the 1990s.[3]

JX 37.  Dr. Blee certified that his representations in the letter were true, correct, and complete. Id.

Then, on January 20, 2007, Joel's attorney sent the IRS a letter, which indicated that, for years prior to his death, the decedent had suffered from Alzheimer's disease.  JX 35.  The letter requested that the IRS carry forward the $48,489 overpayment on the 2001 tax return as a tax credit to the 2002 tax year, and that the IRS grant the $53,292 refund that was requested on the 2002 tax return.[4]  Id. at 3.  A copy of Dr. Blee's September 29, 2006 letter to the IRS was enclosed.  JX 35.

By letter dated May 10, 2007, the IRS denied plaintiff's tax refund claim because it was not timely filed.  JX 38.  Pursuant to 26 U.S.C. § 6511(a), tax refund claims must generally be filed within three years of filing the relevant tax return, or within two years of the payment of the tax, whichever period expires later.  The letter indicated that the tax refund claim filed on the decedent's behalf did not meet this requirement because it was filed more than three years after the tax return was due.  Id. at 1.

## J.  Procedural History

After the IRS denied the tax refund claim, plaintiff filed suit in the United States Court of Federal Claims.  Plaintiff alleges that the decedent suffered from a mental impairment that

---

[3]  Although Dr. Blee's letter to the IRS indicates that consultations with Dr. Norman Luban, the decedent's neurologist, substantiate Dr. Blee's representations regarding the decedent, Dr. Luban was not offered as an expert witness in this case.  Consequently, the court cannot evaluate the reliability or credibility of Dr. Luban's alleged findings; nor has plaintiff made such request.

[4]  Only the $48,489 that was reported as an overpayment on the 2001 tax return is at issue in this case.

caused the decedent's overpayment of $48,489 and his failure to timely file the 2001 tax return.[5] Plaintiff contends that although it did not file a tax refund claim for the 2001 tax year until after the deadline specified in 26 U.S.C. § 6511(a), the claim was not untimely because 26 U.S.C. § 6511(h) applies; § 6511(h) suspends the filing deadline while a taxpayer is financially disabled because he is mentally impaired.  Plaintiff seeks a refund of the $48,489 overpayment.

By order dated January 7, 2013, the court denied plaintiff's motion for summary judgment because genuine issues of material fact were manifest.  Order 1-2, Jan. 7, 2013, ECF No. 98.  In its ruling, the court explained:

> For instance, plaintiff's expert and Mr. Rubinstein's primary care physician from the mid-1980s until his death in August 2005, Dr. Robert H. Blee, stated to the IRS in a September 29, 2006 letter, that Mr. Rubinstein was being treated for progressive memory loss which was of the Alzheimer's type and that Dr. Blee did not believe that Mr. Rubinstein was capable of managing his own affairs during the last four or five years of his life. On the other hand, five months before writing this letter to the IRS, Dr. Blee prepared a report to the Maryland Motor Vehicle Administration, in which he stated that Mr. Rubinstein's memory loss had not changed for years and that Mr. Rubinstein did not appear to have Alzheimer's disease. The court cannot reconcile these two statements without testimony from Dr. Blee. Moreover, other statements by Dr. Blee as well as additional documentary evidence provided by defendant with its motion for leave to supplement create a genuine issue of material fact regarding Mr. Rubinstein's mental state.

Id.  Subsequent to the denial of plaintiff's motion, trial was conducted in Washington, DC.

### K.  Dr. Blee's Expert Report

In anticipation of litigation, Dr. Blee certified an expert report explaining that the decedent was financially disabled.  In that report, Dr. Blee stated that in his "professional, medical opinion," the decedent suffered from "dementia, likely caused by Alzheimer's Disease, which caused him to become mentally disabled at least from 2001 and continuing through the date of his death."  DX 26 at 1.  Dr. Blee also stated in his report that the decedent suffered from dementia, which "considerably diminished his executive functional capabilities, making it difficult to make and execute plans, and hence properly care for himself or manage his personal and financial affairs."  Id.  According to the report, the decedent was "in a state of functional paralysis."  Id.  Dr. Blee's trial testimony on direct examination was consistent with his report. However, as described below, Dr. Blee's expert testimony did not withstand cross-examination by government counsel.  See infra Parts III.C-D, F-G.

### II.  LEGAL STANDARD

The Tucker Act, 28 U.S.C. § 1491 (2012), provides this court with jurisdiction over tax refund suits.  Ontario Power Generation v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004);

---

[5]  Plaintiff requests relief based only on an alleged mental impairment; it does not contend that the decedent suffered from a physical impairment.

Shore v. United States, 9 F.3d 1524, 1525 (Fed. Cir. 1993); Allison v. United States, 80 Fed. Cl. 568, 580-81 (2008). In a tax refund suit, "once jurisdiction is established, 'the plaintiff bears the burden of proof, including both the burden of going forward and the burden of persuasion.'" USA Choice Internet Serv., LLC v. United States, 73 Fed. Cl. 780, 782 (2006) (quoting Sara Lee Corp. v. United States, 29 Fed. Cl. 330, 334 (1993) (internal citation omitted)). "[T]he assessment made by the [IRS] is presumed to be correct and this places an obligation on the taxpayer . . . to rebut a presumption of correctness." Cook v. United States, 52 Fed. Cl. 62, 67 n.6 (2002) (citing United States v. Janis, 428 U.S. 433, 440-41 (1976)). Procedurally, this standard "requires the taxpayer to come forward with enough evidence to support a finding contrary to the Commissioner's determination." USA Choice Internet Serv., 73 Fed. Cl. at 782 (citation omitted). A "plaintiff who is claiming a tax refund must prove [its] case by a preponderance of the evidence." Gingerich v. United States, 77 Fed. Cl. 231, 240 (2007) (internal quotation marks omitted).

Pursuant to 26 U.S.C. § 6511(a), a "[c]laim for credit or refund of an overpayment of any tax imposed by" the statute where the taxpayer "is required to file a return shall be filed . . . within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later." Subsection (b)(1) provides that "[n]o credit or refund shall be allowed or made after the expiration of the period of limitation prescribed in subsection (a) for the filing of a claim for credit or refund, unless a claim for credit or refund is filed by the taxpayer within such period." Id. § 6511(b)(1). Subsection (b)(2) defines two look-back periods, and imposes substantive limitations on the amount of the refund a taxpayer can collect. First, if a claim is filed "during the 3-year period" set forth in 26 U.S.C. § 6511(a), then the amount of the credit or refund "shall not exceed the portion of the tax paid within the period, immediately preceding the filing of the claim, equal to 3 years plus the period of any extension of time for filing the return." Id. § 6511(b)(2)(A). Second, if a claim is "not filed within such 3-year period," then the amount of the credit or refund "shall not exceed the portion of the tax paid during the 2 years immediately preceding the filing of the claim."[6] Id. § 6511(b)(2)(B).

"[U]nless a claim for refund of a tax has been filed within the time limits imposed by [section] 6511(a), a suit for refund . . . may not be maintained in any court." United States v. Dalm, 494 U.S. 596, 602 (1990) (citing United States v. Kales, 314 U.S. 186, 193 (1941)). In United States v. Brockamp, the Supreme Court of the United States, reversing the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit"), held that Congress did not intend for the equitable tolling doctrine to apply to section 6511. 519 U.S. 347, 348 (1997). In Brockamp, each taxpayer alleged that they suffered from a disability that prevented them from filing a refund claim with the statutory time period. Id. The Ninth Circuit had interpreted section 6511 "as if it . . . contain[ed] an implied exception that would permit 'equitable tolling' . . . [and] then applied principles of equity to each case." Id. at 349. In its reversal, the Supreme Court reasoned that, "[t]o read an 'equitable tolling' provision into these provisions, one would have to assume an implied exception for tolling virtually every time a [large] number appears. To do so would work a kind of linguistic havoc." Id. at 352.

---

[6] If no claim is filed, then the credit or refund "shall not exceed the amount which would be allowable under subparagraph (A) or (B), as the case may be, if [the] claim was filed on the date the credit or refund is allowed." 26 U.S.C. § 6511(b)(2)(C).

Thereafter, Congress sought to amend section 6511 because, "in cases of severe disability, equitable tolling should be considered in the application of the statutory limitations on the filing of tax refund claims." S. Rep. No. 105-174, at 60 (1998). Accordingly, the statute now provides that the limitations period for filing a tax refund claim is "suspended during any period of such individual's life that such individual is financially disabled." 26 U.S.C. § 6511(h)(1). "[A]n individual is financially disabled if" he is "unable to manage his financial affairs by reason of a medically determinable physical or mental impairment . . . which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 6511(h)(2)(A). Moreover, an individual "shall not be considered to have such an impairment unless proof of the existence thereof is furnished in such form and manner as the Secretary [of the Treasury] may require." Id. Tolling does not apply during periods in which the individual's spouse or another person was authorized to act on the individual's behalf in financial matters. Id.; accord S. Rep. No. 105-174, at 60.

The IRS has promulgated procedures for establishing financial disability, which require that a taxpayer submit two written statements. Rev. Proc. 99-21, 1991-1 C.B. 960. The first written statement, which must be made by a physician who is qualified to make the determination, should include:

> (a) the name and a description of the taxpayer's physical or mental impairment;

> (b) the physician's medical opinion that the physical or mental impairment prevented the taxpayer from managing the taxpayer's financial affairs;

> (c) the physician's medical opinion that the physical or mental impairment was or can be expected to result in death, or that it has lasted (or can be expected to last) for a continuous period of not less than 12 months;

> (d) to the best of the physician's knowledge, the specific time period during which the taxpayer was prevented by such physical or mental impairment from managing the taxpayer's financial affairs; and

> (e) the following certification, signed by the physician: I hereby certify that, to the best of my knowledge and belief, the above representations are true, correct, and complete.

Id. § 4(1)(a)-(e). The second written statement, which must be submitted by the person signing the claim for refund, must set forth that "no person, including the taxpayer's spouse, was authorized to act on behalf of the taxpayer in financial matters during the period described in paragraph (1)(d) . . . ." Id. § 4(2). Alternatively, if a person was authorized to act on behalf of the taxpayer in financial matters during any part of that period, then the person signing the claim for refund should list the "beginning and ending dates of the period of time the person was so authorized." Id. If a taxpayer has not submitted a tax refund claim that complies with the relevant statutes and regulations, he may not maintain a tax refund suit in this court. 26 U.S.C. § 7422(a).

## III.  DISCUSSION

### A.  The Parties' Arguments

Plaintiff contends that despite the fact that the tax refund claim was filed out of time, it is, nonetheless, still entitled to a refund of the $48,489 overpayment.  Plaintiff argues that because the decedent suffered from a mental impairment during the final years of his life, he was financially disabled within the meaning of § 6511(h), and that the statute of limitations should be suspended for the duration of his disability.

In response, defendant argues that to qualify for that exception, plaintiff must put forward a physician's statement attesting to the taxpayer's impairment, with a certification that the representations contained therein are true and correct.  According to defendant, the glaring inconsistencies between Dr. Blee's MVA physician's report, submitted in 2005, and his 2006 letter to the IRS regarding the decedent's mental status, along with various contradictions among his other statements, negate the credibility of his representations.  Defendant argues that because plaintiff fails to meet its burden of providing a physician's statement that satisfies Revenue Procedure 99-21, it cannot establish that the decedent was mentally impaired, and thus, financially disabled.  Further, defendant contends that there is overwhelming evidence that the decedent did not suffer from any mental impairment, as demonstrated by his ability to engage in everyday activities and substantively manage his complex investments.

### B.  Dr. Blee's Certified Representations to the MVA Contradict His Later Statements to the IRS and Testimony to the Court

Dr. Blee's prior statements regarding the decedent, along with his representations in the MVA physician's report, contradict his later submissions to the IRS and testimony to this court. Dr. Blee's September 21, 1999 letter to the decedent stated that the decedent's score from a mini-mental status examination was essentially stable compared to his prior examinations, and that his memory loss might have been caused by small vessel disease, instead of Alzheimer's disease, given its minimal progression over the preceding several years.  Similarly, the certified physician's report that Dr. Blee sent to the MVA on February 28, 2005, indicated that the decedent's mild depression was controlled with medication; it also stated that his memory loss was mild, without change for many years, and that it may have been the result of normal aging. Specifically, Dr. Blee noted that the decedent did not appear to have Alzheimer's disease, given that his memory had been stable since 1997.  Indeed, Dr. Blee opined that the decedent could probably drive in "non stressful [sic] [and] familiar circumstances," and certified that in his medical opinion, the decedent was physically and mentally capable of safely operating a motor vehicle.  DX 21 at 4.  This evaluation was based on his examination of the decedent earlier that day, his final one before the decedent's death five months later, on August 2, 2005.

However, after the decedent died, Joel contacted Dr. Blee, asking him to "state that his father had a dementing illness and [that] he needed this [medical opinion in writing] for [] tax purposes."  Tr. 203 (Blee).  According to Dr. Blee, Joel "said [that he] need[ed] a letter stating [that his] dad had dementia or whatever[,]" and that Dr. Blee "said fine."  Id.  Thus, Dr. Blee advised the MVA five months before the decedent's death that the decedent had enjoyed a stable

memory for eight years, that he did not suffer from Alzheimer's disease, and that any memory loss was due to normal aging. Yet, nineteen months later, at Joel's request, Dr. Blee certified to the IRS that the decedent had suffered from progressive dementia and Alzheimer's disease for the last ten years of his life. It bears noting that at the time that Dr. Blee submitted his professional opinion supporting the decedent's request for reinstatement of his driving privileges, Dr. Blee based his opinion on a contemporaneous examination of the decedent. Consequently, whereas Dr. Blee wrote to the MVA that the decedent was physically and mentally capable of safely operating a motor vehicle, he later certified to the IRS that the decedent was, during that same period, "not mentally capable of handling his own affairs in a competent way," possibly going as far back as the 1990s, that Dr. Blee had counseled the decedent to enter assisted living due to concerns for his safety, that the decedent "certainly was not capable of making any executive decisions of any meaningful variety," and that the decedent was "essentially mentally paralyzed." JX 37 at 1.

Additionally, Dr. Blee stated in his expert report prepared in anticipation of this litigation that the decedent suffered from dementia that was likely the result of Alzheimer's disease, and that it had caused him to become mentally disabled from 2001, the tax year at issue, until he died in 2005. Dr. Blee indicated that the dementia considerably diminished the decedent's executive functional capabilities, that it was difficult for him to make and execute plans or to properly care for himself and manage his personal and financial affairs, and that he was "in a state of functional paralysis."   DX 26 at 1. At trial, Dr. Blee testified that the decedent's "biggest problem [] was not a memory impairment, [but] a functional impairment." Tr. 58 (Blee). He testified that the decedent had been losing his memory progressively, that his functional ability was probably impaired, and that as of August 2001, "a crisis [wa]s coming." Id. at 86.

The gross discrepancies and contradictions between Dr. Blee's statements to the MVA when the decedent was alive, and his later certifications to the IRS and testimony at trial, are very troubling and undermine Dr. Blee's credibility. Two divergent opinions that purport to describe the same person during the same period cannot be reconciled. Plaintiff has not offered any explanation or evidence indicating that the decedent's mental or physical status changed between Dr. Blee's last examination of the decedent on February 28, 2005, and the decedent's death on August 2, 2005, or that Dr. Blee discovered new information about the decedent's condition between his final evaluation and his letter to the IRS nineteen months later. Indeed, at trial, it was apparent that Dr. Blee was unaware of the decedent's complicated investment strategies, indicating Dr. Blee's limited familiarity with the decedent's activities, activities that demonstrated the executive function that Dr. Blee claimed the decedent lacked. See infra Part III.F. Thus, plaintiff has provided no credible explanation for Dr. Blee's description of the decedent's condition after his death being wholly inconsistent with—and, in fact, diametrically opposed to—his final assessment of the decedent, which was made approximately five months prior to the decedent's August 2005 death.

## C.  Dr. Blee's Original Statements to the MVA Are More Credible Than His Representations to the IRS and to the Court

When comparing Dr. Blee's statements to the MVA regarding the decedent's mental state with his contradictory representations to the IRS to determine which seems more reliable, the

court rejects the notion that a responsible, licensed medical professional would certify as fit to operate a motor vehicle a mentally or functionally paralyzed patient.  Assuming, for argument's sake, that the decedent was indeed mentally paralyzed, then Dr. Blee's certification to the MVA that the decedent could drive endangered the safety of the decedent, other motorists, and pedestrians.  Such conduct would demonstrate extreme recklessness in caring for that patient.  The court does not believe that Dr. Blee would run such a grave risk.  Rather, it is more probable that in 2005, Dr. Blee verified that the decedent was fit to drive because he actually was; thus, it follows that Dr. Blee's subsequent representations to the contrary are unreliable.  Accordingly, because Dr. Blee approved of the decedent operating a motor vehicle in 2005 based upon a then-recent examination, the court finds that Dr. Blee's original statements to the MVA—verifying that the decedent's memory was stable, that he did not have Alzheimer's disease, and that any memory loss was due to normal aging only—were based on his actual opinion of the decedent, and that his subsequent contradictory statements to the IRS and to this court were not.  These discrepancies undermine Dr. Blee's credibility and the reliability of his expert testimony.

### D. The Court Does Not Find Credible the Explanations That Dr. Blee Offered at Trial to Reconcile His Inconsistent Statements

In addition, the court does not credit the explanations that Dr. Blee offered at trial to reconcile the contradictions between his representations to the MVA and his letter to the IRS.  During trial, defense counsel probed the discrepancy between Dr. Blee's statements.  Essentially, Dr. Blee was asked why, if he had truly believed that the decedent was mentally paralyzed, he did not alert the MVA to the extent of the decedent's alleged medical issues and instead certified that the decedent was physically and mentally capable of safely operating a motor vehicle.  Tr. 187; accord 181-86.  Dr. Blee responded that had he not acceded to the decedent's request, the decedent would have stopped coming to see him and "would [then have] be[en] without a doctor."  Id. at 184 (Blee); see also id. at 136-38.  Dr. Blee further testified that he was "afraid" that denying the decedent the opportunity to have his license reinstated would "alienate him from" Dr. Blee "in the time that [the decedent] actually needed [him]."  Id. at 136-38.  Dr. Blee also stated that in his MVA physician's report, he provided enough "red flags" to alert the MVA that the decedent's license should not be reinstated.  Id. at 137-38, 183.

The court declines to credit this testimony by Dr. Blee.  The court finds nothing in Dr. Blee's statements to the MVA that could be construed as a warning or a red flag that the decedent was not fit to operate a motor vehicle; indeed, his representations in the report depict quite the opposite, by eliminating concerns about his ability to drive.  Specifically, in his MVA physician's report, Dr. Blee stated that the decedent's memory had been stable since 1997, that any mild memory loss may have resulted from normal aging, and that he did not appear to suffer from Alzheimer's disease, given the stability of the memory loss.  Additionally, on cross-examination, Dr. Blee conceded that the report indicated that there was "no reason why [the decedent] could[ no]t go out and get into a car."  Id. at 185.  Dr. Blee amplified the contents of his report by testifying that the decedent "felt [that] he had dexterity problems, but [that] in [Dr. Blee's] examination, [he] was[ no]t able to see anything that related to that."  Id. at 183.  Even the statement in the MVA physician's report that the decedent suffered from mild depression that was controlled with medication could not be intended as a warning, because there was no evidence introduced at trial demonstrating that the MVA would refuse to reinstate an

individual's license based on mild, substance-controlled depression.  Nor is Dr. Blee's notation that the decedent would probably have difficulty with rapid mental reaction or unfamiliar areas sufficient to be construed as a red flag.  Dr. Blee ameliorated his own concern by writing that a GPS would be useful, and that the decedent's driving capability could be best determined by a road test with an observer.  By writing that a GPS would be helpful, Dr. Blee indicated that the decedent's difficulty navigating was not due to mental incapacity, but to an unfamiliarity with new locations, just as it would be for any driver.  Moreover, by stating that a road test would best demonstrate the decedent's driving ability, Dr. Blee removed any threshold medical concerns about the decedent's mental capacity to take the wheel.

Dr. Blee also testified that his statement in the report that the decedent could "probably drive in non stressful [sic] [and] familiar circumstances," DX 21 at 4, was a specific red flag to the MVA that the decedent was not eligible to drive, Tr. 139 (Blee).  Once again, the court finds this testimony unconvincing.  A physician attesting that an individual could probably drive in nonstressful and familiar conditions is not tantamount to a medical opinion that the motorist should be denied a driver's license.  Indeed, the form that the MVA sent to Dr. Blee clearly requires a physician's certification; there is no room for "hedging."  Id. at 187 (Wasserman).  Moreover, it is evident that Dr. Blee's statement was not intended to alert the MVA that the decedent was ineligible to drive, given that Dr. Blee marked "yes" where the form stated, "[i]n my professional opinion, this person is physically/mentally capable of safely operating a motor vehicle at this time."  DX 21 at 4.

The court therefore does not find it credible that Dr. Blee refused to inform the MVA of the decedent's supposed mental paralysis because he was afraid of losing him as a patient.  It is unconvincing that Dr. Blee would elevate his fear of losing a patient over the safety risk posed by allowing a mentally paralyzed patient to operate a motor vehicle.  The court does not believe that Dr. Blee would endanger a patient, other motorists, and pedestrians.  Rather, the court finds that Dr. Blee's approval of reinstating the decedent's license indicates that Dr. Blee did not have grave reservations about the decedent's mental capacity.

In addition, the court is not persuaded by Dr. Blee's characterizations of his responsibility when completing the MVA physician's report.  Dr. Blee testified that he was "not responsible" for "certifying" the mental and physical fitness of an applicant, and that his job was to instead "put enough information that the [MVA wa]s alerted" with respect to the decedent's unfitness to drive.  Tr. 136-37 (Blee).  This assertion is wholly unfounded because it contradicts the stated purpose of the MVA form.  Dr. Blee also testified that the "most salient thing [that he] put on" the form to warn the MVA was that the decedent was "capable of driving," but that the decedent's capability "could be best determined by a road test with an observer."  Id. at 138.  With this testimony, Dr. Blee attempted to shift—from himself to the MVA—the medical responsibility for determining the decedent's mental and physical fitness to drive.  Contrary to what he would have the court believe, however, Dr. Blee's suggestion is not logical and reduces the MVA physician's report to a superfluous document.  Indeed, if the MVA was capable of evaluating the decedent's mental and physical fitness to operate a motor vehicle, it would not have sent Dr. Blee a questionnaire in the first place.  Further, the court finds preposterous Dr. Blee's testimony that it was not his responsibility to "certify" the decedent's fitness to drive,

when the form requires—literally—a physician's certification, and Dr. Blee complied with that requirement.

Ultimately, when providing its standard medical form to be completed and certified by an attending physician, the MVA expects not to read between the lines, but to rely on the information provided by the licensed medical professional. Dr. Blee is aware of this fact. Thus, the court is not persuaded by Dr. Blee's testimony that when preparing the MVA physician's report, he actually considered the decedent unfit to drive because he was mentally impaired. Nor does the court credit Dr. Blee's testimony that he genuinely believed that his role did not include certifying the decedent's fitness to drive. Accordingly, Dr. Blee's statements at trial to that effect are not credible.

Instead, the more rational explanation of what actually occurred in February 2005 is that Dr. Blee believed that the decedent was capable of safely operating a motor vehicle. Consequently, Dr. Blee's testimony characterizing his statements to the MVA as veiled warnings amounts to nothing more than an after-the-fact attempt to reconcile his favorable assessment of the decedent's mental condition to the MVA with his subsequent statements to the IRS that the decedent was mentally impaired for at least five years prior to his death.[7]

If Dr. Blee truly believed that the decedent posed a peril on the roads at the time that Dr. Blee prepared the MVA physician's report, he would have contacted the MVA to discreetly convey his concerns. Previously, in an unrelated matter, Dr. Blee did just that; he called the MVA Medical Review Section to state that he did not think that a particular individual should be driving. Id. at 177. Dr. Blee placed that call without any prompting; he had not been asked to complete an MVA physician's report, nor had he been presented with any evidence indicating that the individual had been in a car accident. Id. Rather, Dr. Blee took it upon himself, unsolicited, to contact the MVA regarding a potentially dangerous driver, thereby reflecting a concern for the general welfare of other motorists and pedestrians. Thus, it is clear that when Dr. Blee was asked by the MVA for his opinion, he would convey his concerns. However, Dr. Blee testified that he did not contact the MVA at the telephone number provided on the MVA physician's report because he did not have any questions requiring a call when completing the report. Id. at 176. Indeed, it was only when questioned at trial about the prior incident, during which he had contacted the MVA, that Dr. Blee acknowledged that in this case, he could have picked up the telephone, called the MVA, and said that the decedent was a "menace to the roads." Id. at 184. His failure to do so indicates that he did not have any such reservations about the decedent driving when completing the physician's report, and that his trial testimony that he did possess such concerns is not credible. Accordingly, the court does not find credible Dr.

---

[7] Plaintiff's counsel stated at trial that Dr. Blee acknowledged that the MVA physician's report "was not his best work," and that it was "embarrass[ing]" for Dr. Blee to discuss it. Tr. 185-86 (Broyles). In one section of the report, Dr. Blee did not answer eleven out of eighteen questions, and for one inquiry, marked both "Good" and "Fair," instead of just one choice. DX 21 at 4. Dr. Blee, himself, admitted that he had provided a slipshod response when completing an official government document. Overall, this further erodes Dr. Blee's credibility. With respect to his specific findings in the report, however, the court believes that Dr. Blee's MVA certification is true, including that the decedent was fit to drive, because the court does not believe that Dr. Blee would place a long-standing patient, other motorists, and pedestrians at risk.

Blee's attempts at trial to recast his statements in the MVA physician's report in order to reconcile them with his letter to the IRS.

### E.  Plaintiff's Request for a Physician's Certification, and Dr. Blee's Resulting Revised Assessment of the Decedent

Weighing the evidence presented at trial, the court concludes that Dr. Blee's revised assessment of the decedent in his September 2006 letter to the IRS attesting to the decedent's mental impairment was not based on any new information or other legitimate factors giving rise to an altered or amended opinion.  Rather, Dr. Blee's opinion was constructed purely to satisfy Joel's request for a physician's letter—in order to meet the statutory requirement to suspend the applicable limitations period for seeking a tax refund.  Dr. Blee admitted at trial that when Joel explained that he needed a letter stating that the decedent had "dementia or whatever" for "tax purposes," Dr. Blee acceded.  Tr. 203 (Blee).  Moreover, Joel, himself, testified that he did not expect his April 2006 letter to the IRS requesting a tax refund "to work," and that this was later echoed by his friend, a tax attorney, who informed him that he was "out of luck."  Id. at 439 (J. Rubinstein).  Joel then retained his current counsel, "who knew [of] this exception," and told him that he "need[ed] to get a letter from a physician."  Id.  It was this advice that prompted Joel to contact Dr. Blee for the first time "in [his] life."  Id. at 441.  Joel testified that he sent Dr. Blee a "link to a web page" outlining the requirements of the letter, instructing him that "there is a certain sentence or a paragraph that must be in [his] letter for it to count, and [that he could] find that wording on [the] web page."  Id. at 440.

In addition, the context in which the two competing assessments were written is revealing.  The 2005 MVA physician's report was prepared contemporaneously with a medical examination of the decedent, and not at the request of the family, nor in anticipation of any litigation.  By contrast, Dr. Blee's 2006 letter to the IRS was prepared for just those reasons.  Thus, based on Dr. Blee's and Joel's concessions, and upon examining the events surrounding the contradictory documents, it is evident that the representations in Dr. Blee's letter to the IRS were crafted solely for the purpose of invoking the statutory exception to obtain a tax refund, and were not based on any observations or opinions held by Dr. Blee concerning the decedent during his final years.  This tactical maneuvering persuades the court that Dr. Blee's trial testimony is unreliable.

### F.  Dr. Blee's Concessions Regarding His Statements, Evaluation Method, and Limited Awareness of the Decedent's Activities

Other contradictions, weaknesses, and admissions in Dr. Blee's trial testimony compound the court's concern regarding his credibility and the reliability of his expert testimony.  Dr. Blee conceded that there were no documents indicating that the decedent had experienced progressive memory loss.  Id. at 228 (Blee).  Further, Dr. Blee claimed to have made a substantial review of literature regarding executive dysfunction, which he believed was the key to plaintiff's case.  Id. at 57.  However, the medical literature that he read consisted solely of abstracts of articles, and not even the full articles, and three chapters of a handbook on Alzheimer's disease.  Id. at 61-62.  Moreover, despite making determinations in his expert report regarding the decedent's executive function, Dr. Blee admitted that executive dysfunction is hard to measure and that he had never

used any type of diagnostic test to determine whether a patient had a significant impairment in executive function. Id. at 58-59. Indeed, Dr. Blee acknowledged that "you will never see an internist record that has a test for executive dysfunction," a noteworthy admission, given that Dr. Blee was the decedent's internist and plaintiff's sole expert witness. Id. at 64. Instead, Dr. Blee testified, testing for executive function is typically done by a psychologist. Id. at 59, 72.

Moreover, the results of the decedent's MMSE scores from 1997 to 2005, the tests that Dr. Blee did administer, reflect no decline in mental acuity. DX 37. Dr. Blee's medical records indicate that the decedent's lowest MMSE score was 26 out of 30, which occurred on three of the ten tests that were administered between December 10, 1997 and February 28, 2005. Id. According to the MMSE testing scale, a score of 26 indicates "mild" cognitive impairment. DX 23. While the MMSE scale provides that a score as low as 21 is considered mild, of the decedent's scores, his lowest was 26. Id. And, of the four MMSEs taken by the decedent during the last four years of his life, from July 2001 until February 2005, he scored 29—one point shy of a perfect score—on three of them, as well as 28 on three others. DX 37. Thus, the decedent's scores from these four MMSEs reflect only a mild degree of cognitive impairment according to the MMSE's grading guidelines. DX 23. Even as Dr. Blee opined that he "felt" that there was a progression of memory loss, Tr. 221 (Blee), he acknowledged at trial that there were no documents supporting his opinion, id. at 228. Further, the MMSEs administered by Dr. Blee established that the decedent suffered from neither progressive memory loss nor Alzheimer's disease.

In addition, Dr. Blee testified that to diagnose executive function impairment, one has to "almost live with a person and watch the person and study the person to see how their functional capability is." Id. at 58. Dr. Blee admitted, however, that he only spoke with the decedent for twenty-five minutes each time that he came in for physical examinations. Moreover, while Dr. Blee indicated that it would "absolutely" be "best to speak with a spouse or a child or a family member" to help determine whether a patient had executive dysfunction, id. at 59, Dr. Blee had no contact with any members of the decedent's family, and did not even know any existed, until after the decedent's death. The court therefore cannot credit Dr. Blee's finding of executive dysfunction because he failed to satisfy his own evaluation criteria of speaking with the decedent's family members or administering the appropriate tests.

Dr. Blee's assessments of the decedent were based not only on limited interactions, but also on limited information. He was entirely unaware of the decedent's successful, complex investment activity, which was ongoing until the decedent's death. Id. at 215. Remarkably, Dr. Blee testified that he would have been "surprised if [the decedent] was [] buying and selling stocks in [] early 2000." Id. In reality, though, the decedent was doing so—and with great success—until his death in 2005. When Dr. Blee was informed at trial that the decedent had researched and carried out his bank demutualization investment strategy entirely on his own, and that he had recorded significant information regarding his bank investments in the Basis Book—and further, when Dr. Blee was shown a copy of the notebook—Dr. Blee conceded that because he knew little about the decedent, he "wouldn't have thought that [the decedent] would have been doing [that] kind of notekeeping." Id. at 214. He testified that he had "no clue that [the decedent] had a financial life," particularly one that had made him a millionaire, and had instead

20

"imagine[d]" that the decedent was living off of a "pension or something along those lines." Id. at 206.

When Dr. Blee was asked about the implications of the decedent's investments in bank demutualizations, including that the decedent held seventy-five bank accounts at the time of his death, Dr. Blee admitted that this conduct demonstrated executive function on the part of the decedent. Id. at 217. With respect to the decedent's complex notekeeping in the Basis Book and his having single-handedly executed his complex bank demutualization strategy, Dr. Blee acknowledged that he was unaware of this activity, id. at 214-15, 217, and that it indicated that the decedent "was good in th[e] sphere" of executive function, id. at 218. Dr. Blee also conceded that the decedent demonstrated executive function by making estimated tax payments for 2001 and several other tax years. Id. at 218-19.

Further, Dr. Blee testified that the decedent informed him on June 15, 2004, less than fourteen months before his death, that he did his own grocery shopping and house cleaning. Id. at 129. Dr. Blee acknowledged that during a prior deposition, he testified that in 2004, the decedent was doing "amazingly well for someone who had some memory impairment dating back to 1997. . . so something was working." Id. at 202. At trial, defense counsel cross-examined Dr. Blee regarding the decedent's ability to handle all of his financial and personal affairs himself—including paying bills, banking, grocery shopping, and laundry. Id. at 223-24. When Dr. Blee was asked to reconcile this activity with his statement to the IRS that the decedent "certainly was not capable of making any executive decisions of any meaningful variety," Dr. Blee admitted that this statement to the IRS "may not [have] be[en] completely accurate." Id. at 224.

Dr. Blee also testified that an individual could be suffering from dementia but remain functioning. Id. at 214-15. He further explained that an individual with dementia could excel in some aspects of life, despite the disease. Id. Indeed, Dr. Blee testified that "it takes some executive facility to be able to pick a stock and buy it," something that the decedent did through his final years. Id. at 215. Thus, based on Dr. Blee's admissions that the decedent demonstrated executive function in different areas of his life, it does not follow that the decedent could display executive function in his financial management and recordkeeping while simultaneously be "financially disabled" within the meaning of the statute and revenue procedure. Consequently, Dr. Blee's concession on cross-examination that the decedent's investment and tax payment activities indicated that the decedent possessed executive function contradicts Dr. Blee's direct testimony that the decedent was mentally impaired. Ultimately, Dr. Blee's concession defeats plaintiff's argument that the decedent was financially disabled as contemplated by the statute and revenue procedure.

There are other contradictions in Dr. Blee's representations, as well. Dr. Blee testified that the best way for a physician to diagnosis a patient is by conducting an in-person examination. Id. at 172. During Dr. Blee's final examination of the decedent in 2005, five months before his death, he scored 29 out of 30 on his MMSE, and Dr. Blee certified in the MVA physician's report that the decedent did "not appear to have Alzheimer[']s[,] given the stability of" his memory since 1997. DX 21. Yet, in his 2006 letter to the IRS, Dr. Blee indicated that the decedent suffered from progressive dementia and Alzheimer's disease during

the last ten years of his life, or essentially since 1995.  Dr. Blee's expert report for this litigation also opines that the decedent likely had Alzheimer's disease.  However, at trial, Dr. Blee admitted that although his letter to the IRS stated that the decedent had Alzheimer's disease, that diagnosis was incorrect—that the decedent did not actually suffer from it.  Indeed, Dr. Blee testified several times that the decedent did not have Alzheimer's disease, id. at 167, 184, 230.  According to Dr. Blee's trial testimony, the MMSE, one of the classic diagnostic tests for Alzheimer's disease, did not indicate that the decedent had Alzheimer's.  Id. at 164-67.  And despite the decedent's concerns regarding his balance, Dr. Blee testified that he had found that the decedent had no manual dexterity problems.  Id. at 185.  Further, Dr. Blee testified that the contents of his February examination notes, opining that the decedent did not appear to have Alzheimer's disease, were accurate.  Id. at 181-82.

Dr. Blee acknowledged the obvious contradiction between his 2006 letter to the IRS and his subsequent trial testimony that the decedent did not have Alzheimer's disease.  Id. at 221.  Dr. Blee attempted to explain the inconsistency by testifying that he deliberately provided the erroneous Alzheimer's diagnosis to the IRS because he was trying to provide a simple explanation to individuals lacking medical degrees.  Dr. Blee implied that to correctly identify and describe the decedent's condition—"multi-infarct dementia"—would be beyond the grasp of a lay person's comprehension.  Id. at 225, 230.  Yet, according to Dr. Blee, the two conditions are in actuality "totally different ball(s) of wire."  Id. at 230-31.  The court does not find reliable a medical expert falsely representing to an agency or court that a patient suffered from one condition because the actual, entirely different diagnosis was too complex for agency personnel to grasp.[8]  Moreover, Dr. Blee's testimony failed to support a diagnosis of multi-infarct dementia, itself; he never tested the decedent for the condition, nor reliably diagnosed the decedent with executive dysfunction.  Id. at 59, 67, 72, 164-66, 180-82, 184-86, 217, 228-31.  This testimony therefore further demonstrates that Dr. Blee's expert opinion is unreliable.

Overall, Dr. Blee's competing medical opinions regarding the decedent's mental state are riddled with inconsistencies, the most glaring of which are the contradictions between his certified, physician's report to the MVA and his representations to the IRS and the court.  Indeed, the opinions expressed by Dr. Blee in the MVA physician's report and his statements concerning the decedent in his letter to the IRS are antithetical to each other—in spite of being prepared months apart, and more saliently, despite the fact that they address the same time frame in the decedent's life.  Unlike the typical case where there is a battle between expert witnesses, here we find an expert witness who is battling his own divergent opinions, and attempting to reconcile contradictory statements.

Consequently, based on Dr. Blee's inconsistencies, his various admissions at trial that further undermine his expert testimony and conclusions, the admitted weaknesses in his evaluation methodology, and his lack of a specialist's expertise in diagnosing a mental impairment, the court finds that Dr. Blee's statements to the IRS and his trial testimony are unreliable.  See Porter v. Sec'y of HHS, 663 F.3d 1242, 1260 (Fed. Cir. 2012) (O'Malley, J., dissenting) (stating that factfinders "are expected to consider reliability, which often turns on

---

[8] Expert medical testimony that is deliberately false because the witness believes that an agency or judicial officer cannot comprehend a diagnosis, descriptions of symptoms, and the effects of the disease on the patient is, at best, a disservice and problematic.

credibility"). The court is thus compelled to reject Dr. Blee's evidence on two grounds—lack of reliability, and lack of credibility. See Redondo v. United States, 542 F. App'x 908, 910-11 (Fed. Cir. 2013) (rejecting the physician's certification for being inadequate, determining that the plaintiff was therefore not financially disabled and that the statute was not suspended, and dismissing the suit); Porter, 663 F.3d at 1250-51 (stating that "[a]ssessments as to the reliability of expert testimony often turn on credibility determinations," that factfinders are "entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence," that the factfinder's "decision often times is based on the credibility of the experts . . . and [that] such credibility findings are virtually unchallengeable on appeal") (internal citations and quotation marks omitted); Celvis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 929 (Fed. Cir. 2012) (remarking that the expert's "revisionist history" was "unpersuasive"). Accordingly, without reliable testimony from a credible physician establishing that the decedent suffered a financial disability, the limitations period for filing a tax refund claim set forth in 26 U.S.C. § 6511(a) cannot be suspended.

### G. Dr. Blee's Trial Testimony Is Contradicted by the Decedent's Full Range of Activities During His Final Years

Dr. Blee's testimony at trial is further belied by the extent of the decedent's activities until his death. Between 1982 and 2005, the decedent lived by himself, and as his son, Michael, testified, performed daily living activities, including cooking meals and clothing himself, "until the day he died." Tr. 504 (M. Rubinstein); see also id. at 506, 523-34. Other than preparing his tax returns, the decedent handled all of his financial and personal affairs himself, including paying bills, banking, grocery shopping, and laundry. In addition, at some point during the last two years of his life, the decedent hired an individual to mow his lawn. And, although his house was cluttered with paper, it was sanitary.

In 2001, the decedent made three separate donations to WETA, one to the American Society for Technion-Israel Institute of Technology, one to the Jewish Social Service Agency, and one to the Jewish Community Center of Greater Washington. He also paid a membership fee to Congregation Har Shalom, as well as dues to its men's club. Further, until his death, the decedent maintained friendships with three different people who he had known since the 1970s.

The decedent's children never discussed any form of involuntary commitment or mental health examination for him. Moreover, Michael did not believe that the decedent was in any danger while living by himself. Because the decedent was able to carry out daily living activities, Michael had no intention of trying to forcibly remove the decedent from his house. Id. at 523-24.

In addition, the decedent was aware of his tax responsibility. He had close interaction with his son, Joel, as Joel prepared the decedent's tax returns. This included Joel asking the decedent questions from time to time, such as whether a charitable donation was deductible. When Joel completed the tax return, he would give it to the decedent to be filed. On a few occasions over the years, the decedent applied for and received an extension of time to file his tax returns.

Although it is true that the decedent failed to timely file tax returns for the 2001-2004 tax years, he made six estimated payments toward his 2001 tax liability, four payments toward his 2002 tax liability, two payments toward his 2003 tax liability, and one payment toward his 2004 tax liability.  He deliberately made overpayments in order to avoid a penalty for making an underpayment, as Joel acknowledged at trial.  As explained above, Joel testified that overpayments were part of the decedent's strategy to build a substantial cushion in tax prepayments.  Further, the decedent wrote a check for each payment toward his tax liability.

The decedent also invested in bank demutualizations and engaged in a complex investment strategy.  Between 2001 and 2005, he opened new bank accounts at eight different banks.  At the time of his death in August 2005, he held seventy-five bank accounts.  Moreover, the decedent researched and executed this bank demutualization investment method completely by himself.  Employing this approach after he retired made him a "millionaire several times over," as he would "tak[e] what he had and invest[] it in this strategy."  Id. at 429 (J. Rubinstein).  With respect to the decedent's tactics and ability, Joel testified, "I can't say [that] there are ways he could have done even better."  Id. at 435.  The decedent's "very large income" was "enough to take care of himself with considerable left over for further investment."  Id. at 382-83.  Indeed, the value of the decedent's stocks and bonds at the time of his death was over $4.7 million.

Further, the decedent bought and sold stocks for years, including in the years before his death, personally making stock purchases and sales.  On January 5, 2000, he bought 20,000 shares of Security Financial Bancorp, Inc. common stock.  Between 2001 and 2004, he made at least four stock purchases.  One such purchase was his acquisition of shares of NewAlliance Banc on March 1, 2004, in which he instructed his broker to acquire well over 12,000 shares of the bank's stock during the initial public offering.  On the date of his death, the stock's value had increased by 46%.  Between 2001 and his death in 2005, the decedent made at least twenty-five stock sales, one of which exceeded $364,000.  Four of these stock sales occurred in 2001.  In addition, the decedent engaged in at least one or two more stock sales between 2002 and 2005.  One of these sales involved instructing his broker to sell his shares in New York Community Bancorp, Inc. on June 18, 2004, just over one year before his death.

The decedent's active stock market trading and the success of his investment strategy demonstrate his financial savvy and wherewithal during the final years of his life.  According to Joel, the decedent's investments were "highly profitable."  Id. at 435.  Indeed, Joel conceded at trial that he "d[id no]t support" the contention in his attorney's January 20, 2007 letter to the IRS that because of his Alzheimer's disease, the decedent sold securities that he should have held.  Id. at 436-37.

The decedent also maintained the Basis Book, in which he recorded all activities regarding his securities.  He documented the transaction involved in acquiring a security, some of the history behind the transaction if it was the result of a merger, dividends that issued, and the value of the shares.  When there was a forced sale of his stocks, he recorded the resulting income.  The fact that the decedent documented that he directed a broker on August 13, 2001, to sell his stock in Security Financial Bancorp, and to then wire the proceeds to his Presidential money market account—a sale in which he made over $364,000—reflects a continued display of

financial acumen, activity, and attention to detail.  At trial, Joel admitted that the decedent also used the notebook to document complicated stock splits and calculate dividends and stock values.  The date that the calculations were made by the decedent can be traced through 2005, the year of his death.  Moreover, Joel acknowledged that there was "no doubt" that the Basis Book was "of great assistance" to him as he prepared the decedent's tax and estate returns after his death, an admission that the decedent meticulously maintained detailed information regarding his financial matters even in his final years.  Id. at 313-14.  In sum, this evidence demonstrates that the decedent was capable of living on his own, performing daily activities, and actively managing his investments, thereby further discrediting Dr. Blee's trial testimony regarding the decedent's alleged paralyzed mental state.

### H.  The Decedent's Failure to File the 2001 Tax Return Was Caused by Reasons Other Than a Mental Impairment

Plaintiff argues that the decedent's failure to file the completed 2001 tax return that Joel gave to him is indicative of a paralyzed mental state.  However, a more likely explanation is evident when viewing the decedent's failure to file the tax return within the context of his relationship with Joel.  Beginning in 2000, relations between Joel and the decedent became increasingly strained, and they engaged in numerous arguments.  In 2001, Joel prepared his father's 2000 tax return, which was filed by the decedent.  Because Joel was unaware of one of the decedent's investments, the 2000 tax return contained an error; the IRS discovered the error and assessed additional taxes and penalties.  According to Joel, this caused the decedent to believe that his son was not completely reliable.  Thus, when Joel prepared the 2001 tax return, the decedent felt the need to review it.  Ultimately, the decedent did not file the 2001 tax return.  When Joel found the tax return after the decedent's death, he observed that it contained check marks on some of the interest and dividend items, notations that the decedent had made while comparing the tax return to an IRS transcript of income.  Based on Joel's own testimony, the check marks "show[ed] that [the decedent had been] attempting to audit [Joel's work]."  Id. at 279.  It thus appears that the decedent's failure to file the tax return was not due to forgetfulness, but rather, that he delayed filing it so that he could first examine it.

Further, when Joel contacted the decedent in 2002, the decedent said that he did not want to speak with Joel, refusing his apology, other attempts to discuss their rift, and offer to work on the decedent's tax returns.  It is therefore likely that the reason that the decedent did not file his tax returns for 2002, 2003, and 2004 was because he did not obtain prepared tax returns from Joel, as he had done in the past.  Additionally, as described above, the decedent made six payments toward his 2001 tax liability, four payments toward his 2002 tax liability, two payments toward his 2003 tax liability, and one payment toward his 2004 tax liability.  He deliberately made overpayments for each year to avoid a penalty for making an underpayment.  Thus, it is also possible that he did not feel an urgency to file tax returns for the 2001-2004 tax years, as he had already made payments toward his liability for each such year.  While the decedent's failure to file these returns could have been caused by forgetfulness, based on Dr. Blee's statements to the MVA that the decedent's mental condition was stable and that any mild memory loss was due to natural aging, it is also possible that the decedent did not file the tax returns because of general neglect, recalcitrance, normal aging, and/or a belief that he had already met his tax obligations because he had made payments toward his liability.

25

Indeed, that conclusion is supported by Dr. Blee's testimony.  Putting aside the question of whether the decedent was medically impaired, Dr. Blee opined that based upon his familiarity with the decedent, he was capable of taking a box containing financial information to a tax preparer for a return to be prepared, and of subsequently filing it.  Id. at 228-29.  Dr. Blee also testified that the decedent could handle his own financial affairs.  Id.  This testimony reflects that the mild memory loss and changes that the decedent experienced did not rise to the level of a mental impairment as contemplated by the statute, and was instead likely caused by and indicative of normal aging.  More salient to the central issue in this case is Dr. Blee's testimony that the decedent was capable of taking his tax information to a tax preparer and then filing the return(s).  That testimony necessarily demonstrates that the decedent could not have been mentally impaired so as to be deemed financially disabled.  Ultimately, that specific testimony dealt a fatal blow to plaintiff's case.

Based on the evidence presented at trial, it is evident that the decedent was active, both physically and mentally, through his final years.  Plaintiff has consequently failed to demonstrate that the decedent suffered from a physical or mental impairment, as required by 26 U.S.C. § 6511(h), that rendered him financially disabled.[9]  See Pleconis v. IRS, No. 09-5970, 2011 WL 3502057, at *5 (D.N.J. Aug. 10, 2011) (determining that the plaintiff failed to demonstrate mental impairment pursuant to the statute because he was able to sign his company's income tax returns, talk on the phone, watch television, surf the internet, drive to the pharmacy, do light grocery shopping, and help run his company); Glover v. United States, No. 05-60044, 2005 WL 1926614, at *2 (E.D. Mich. July 11, 2005) (stating that even as the plaintiff had suffered two losses in his family, he was not mentally impaired because he could manage his other financial responsibilities, including making timely mortgage, car, and utility payments); Haller v. Comm'r, No. 11448-08, 2010 WL 2680705, at *4 (T.C. July 6, 2010) (holding that the petitioner had not shown that he was financially disabled under the statue because even as he had a physical illness, he was physically and financially able to care for his children, and was aware of his obligation to file a federal income tax return); Perkins v. Comm'r, No. 14587-06L, 2008 WL 4977439, at *3 (U.S. T.C. Nov. 20, 2008) (indicating that a taxpayer who earned significant amounts of income, entered into lease agreements, and was predominantly in charge of the household was not financially disabled).  Accordingly, the limitations period for plaintiff's tax refund claim cannot be suspended.  Because a properly filed claim is a prerequisite to

---

[9]  Joel was estranged from the decedent for nearly the last three years of his life, Tr. 342 (J. Rubinstein), and Michael "lost contact with" the decedent in April 2004, or about fourteen months before he died, id. at 521 (M. Rubinstein).  By contrast, their sister "never cut off communications" with their father, remaining "in contact with him that whole last year" before his death.  Id. at 521-22.  It is noteworthy that despite the decedent having the most contact with his daughter, plaintiff declined to call her to testify regarding her father's alleged mental paralysis in his final year.  If plaintiff possessed evidence to meet its burden of demonstrating that the decedent was mentally impaired, it would seem that the individual with the most contact with the decedent would be able to provide it, especially the only child from whom he was not estranged.

maintaining a tax refund suit in this court, see 26 U.S.C. § 7422(a), plaintiff's complaint must be dismissed.[10]

## IV.  CONCLUSION

Plaintiff's tax refund claim for an overpayment of $48,489 in income taxes, as reported on the decedent's 2001 tax return, was denied as untimely by the IRS.  The evidence that plaintiff offered at trial to establish that the decedent suffered from a mental impairment pursuant to 26 U.S.C. § 6511(h) was unpersuasive.  Plaintiff's expert witness, whose testimony was essential to proving its case, was neither reliable nor credible.  The extent of the decedent's daily activities and his substantial management of complex investments further demonstrate that the decedent did not possess a mental impairment so as to render him financially disabled.  Consequently, plaintiff has failed to sustain its burden of demonstrating by a preponderance of the evidence that the decedent was financially disabled, and that the limitations period for filing the tax refund claim was therefore suspended.[11]

Accordingly, because plaintiff has not established that the decedent satisfied the exception under the statute to be considered financially disabled, plaintiff's claim is untimely, and the case is **DISMISSED**.  No costs.  The clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[10]  The court has considered all of the arguments made by plaintiff, and to the extent that it has not addressed them herein, considers them moot, irrelevant, or without merit.

[11]  It is evident that the decedent experienced some loss of cognitive function, as demonstrated by Dr. Blee's MVA physician's report.  Nonetheless, the decedent's mental state did not rise to the level of mental impairment required to establish financial disability within the meaning of the statute and the IRS's revenue procedure.